# Vollmer's Appeal.

1. A party-wall in Philadelphia must be a solid wall of brick or stone, without openings.

2. If the first builder does not comply with the law and make the wall a solid one, he becomes a trespasser and wrongdoer.

3. An owner of a lot erected a party-wall with windows in it; such wall is a nuisance and is within the restraining powers of equity.

4. The plaintiff in her bill complained of the erection by her adjoiner of a party-wall with openings. The defendant in his answer averred that he did it by license of a former owner of plaintiff's lot. *Held*, that this was not responsive to the bill, but was an affirmative allegation in avoidance of the plaintiff's demand, which should be established by independent testimony.

5. If there was a revocable license by a former owner,·the sale and conveyance of the land operated as a revocation.

February 17th 1869.   Before THOMPSON, C. J., READ, SHARSWOOD and WILLIAMS, JJ.   AGNEW J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Philadelphia:* In Equity : No. 95, to July Term 1868.

This was a bill filed July 19th 1864, by Malvina A. King against Gottleib Vollmer.

The bill set out the ownership by Judith McCall of a messuage and lot of ground 51 feet 4 inches westward from the west side of Eleventh street, on the south side of Chestnut street, Philadelphia, containing in front on Chestnut street 24 feet, and extending of that width southward 101 feet, and then narrowing on the east side 8 feet, and widening on the west side 4 feet, and extending further southward 128 feet to Sansom street of the width of 20 feet : that Judith McCall died in 1829, having devised said lot to her daughters, Margaret, Harriet and Catharine and the survivor in fee, but upon the death or marriage of either of the daughters, her share should go to the others.   Harriet McCall died in 1848 and Catharine in 1859, both unmarried, whereby the whole title vested in Margaret in fee.   Margaret by her will proved January 6th 1860, devised her real estate to her brother, Robert McCall, and her sister, Catharine McCall, during their joint lives and the life of the survivor, and the residue of her real estate to her nephews, Peter McCall, Harry McCall and George Read ; Robert McCall and Catharine McCall died in the lifetime of Margaret McCall.   On the 6th of April 1864, these three nephews conveyed to the plaintiff all their interest in the above lot ; that the plaintiff is extending her messuage of the width of

24 feet to the depth of 98 feet, for the purpose of making the
first and second stories into stores, one for making and selling
millinery, &c., and expects to have many females employed, who
will be entitled to the privileges and privacy of the yard connected
with the store; that the cost of the plaintiff's premises and im-
provements is above $35,000; that she is entitled to use, &c., the
messuage, &c., for her own benefit, enjoyment, &c., for ever, so
that she shall not be deprived or annoyed in such enjoyment, &c.,
as the defendant claims he has a right to do, and threatens to con-
tinue to do, to the irreparable damage of the plaintiff and ruin of the
value of said premises and business as thereafter set forth : that
the defendant owns and occupies a lot adjoining the above-men-
tioned lot of the plaintiff; that before the death of Catharine
McCall, and whilst the said life estates were subsisting, and the
premises of the plaintiff were in the tenure of one A. Tompkins
as tenant for years, the defendant, under the pretence that he in-
tended to build a party-wall in accordance with law, entered on
the plaintiff's lot, laid the foundation and erected a wall of
great length and thickness on the west side of the plaintiff's lot
northward from Sansom street, about 100 feet, of the height of one
story, and knowing that there could be no owner of the fee of the
lot during the life estates to call him to account, intending to build
windows in the remaining stories of the building designed for a fac-
tory, and in abuse of the right allowed him by law to take part of the
plaintiff's ground as a rest for a party-wall, extended said wall five
stories high under pretence of erecting a party-wall; and contrary to
law inserted window-frames, sashes and vacant spaces in said wall,
and hung window-shutters on the same or some of them wholly upon
the ground of the plaintiff, to wit, four windows, frames and sashes
in each of the four upper stories, and has maintained them to the
injury of the plaintiff's estate and discomfort of the occupants of
her said premises, and has enjoyed an easement of the annual
value to him of $300, which belongs to the plaintiff's said pre-
mises; that upon the plaintiff's asking from defendant an acknow-
ledgment of her right to the said wall so as to exclude any pre-
sumption from length of time, the defendant refused, and said he
would close the windows; that the request to remove the windows
has been frequently repeated and the defendant has refused, alleg-
ing that no one looks out of the windows, and that they afford
the only light in the other part of the shop; and pretends that
the wall and ground on which it stands is his; that the defendant
insists that the plaintiff desires a lawsuit, and he has but the
alternative to meet it; that the plaintiff will suffer in the user of
the premises in having the domestic privacy of herself, family and
those employed by her exposed to men, and the value of her pre-
mises consequently lessened; that to close the windows by her
authority scaffolding and materials must be placed on her lot at

[Vollmer's Appeal.]

unreasonable cost, which ought not to be imposed upon her by the defendant's wrong; that the defendant pretends that the law relating to party-walls authorizes both the use of her ground for a rest, and also the making of many windows for workmen to work at, and overlook and constrain the doings of his neighbor so as to oblige her to build or to sell her premises at reduced rate to remove the nuisance without a lawsuit. A number of interrogatories were appended to the bill.

The prayer was for an injunction to restrain the defendant and prevent the continuance of the nuisance and the liability of the defendant, &c., to being so overlooked, injured, &c., by the said windows; and he be caused to abate the same by causing them to be removed and the spaces built up with brick, as if the same were a division party-wall; and for further relief, so that the defendant shall not have the advantage of his wrongdoing as a right or the plaintiff suffer the wrongful taking of her ground as a rightful taking.

The defendant answered amongst other things, denying that he had in any way deprived the plaintiff of her right to the enjoyment of her messuage or lot, &c., or that he had pretended that he had a right to disturb her; or that he had done or threatened that he had a right to damage her property or the value of it; or that he has invaded the privacy of her domicile, or that she had been exposed to annoyance by persons employed in his factory; or that the defendant or females employed by her are exposed to annoyance whilst using her yard or otherwise engaged in their lawful pursuits on her premises. He further denied that he had taken advantage of the law to build on the plaintiff's lot, so as to have the free use of it without cost, by erecting numerous windows in his building, and window-frames put partly on her ground and partly on his own ground, but averred that all the windows in his back building are almost if not entirely on his own ground, and not upon that which he had a right to take in using the said party-wall. He further averred that in 1856 he wished to extend his buildings on his own ground south from his main building on Chestnut street; that he employed an experienced builder to put up a brick building beginning on Sansom street, and extending on his lot to his front building; that the foundation was laid by measurement under the direction of the authorized officer of Philadelphia, in pursuance of the Act of Assembly regulating party-walls, and the builder laid the east wall over on the plaintiff's lot according to the measurement of the officer, so that the owner of that could use it when she wished to build there; that he erected his back building on the foundation 100 feet long, the width of the lot, and five stories high. When the first story had been raised and put up about 20 feet, the builder put four windows in the second story, about 24 feet from the ground, and each story

four windows more, except one, so that there are fifteen windows; this was done by the builder without any direction from the defendant, the builder at the time saying to the defendant that when the owner of the east lot wished to use the party-wall, all the defendant need do would be to take out the window and sash, fill up their spaces with brick. He further averred that when the windows were put in by the workmen, Harry McCall, who claimed to be the owner of the house and lot now owned by the plaintiff, told the defendant that he had no objection to the windows being placed in the wall, but McCall or the owner of the lot should not be prevented from erecting a building on their lot, and the defendant should not claim any privilege from the use, to which the defendant agreed and now agrees, and so informed the plaintiff, that if she desires to use the party-wall, he is ready to put in the necessary brick, so that joists and girders may be put thereon, she paying the value of the party-wall, that he does not claim any easement in the lights. He denied that there were shutters on the east side of his building, or that the windows were constructed on the premises of the plaintiff, but averred that they were on his own lot. He further denied that he knew there was no one to call him to account as to the manner in which he was using the party-wall, but all the owners knew he was using it, and he believed all assented to it. He admitted that the plaintiff re- ,quested him to close up said windows, to which he replied he was ready to do so when she wished to use the party-wall, until which time he claims that he is not bound to close them, and denied that he had done or intended to do any injury to the plaintiff, or to her estate or property.

He further answered that the windows are 3 by 4 feet, placed on the inner side of the wall, which in the first and second stories is 18 inches thick, in the third story 15 inches thick, and in the fourth and fifth stories 13 inches thick, that the distance between the outer edge of the brick wall and the window-frame is about $4\frac{1}{2}$ inches, that the window-frames are $2\frac{1}{2}$ inches thick, there are no window-sills, that the distance between the inner surface of the frames and the inner surface of the wall is about 6 inches, and that the foundation is 22 inches in thickness; he further denied that the tenants for life were ignorant of his intention to put in the windows, but believed that they were informed of the fact by Harry McCall, and if they had any remedy against the defendant they could have asserted it.

A general replication was filed, and an examiner appointed.

Charles Stein, a witness for plaintiff, testified that as master bricklayer he worked at the wall, and that no windows were put in whilst it was being erected; that about six weeks afterwards he took bricks out and put windows in.

Samuel M. Reynolds, also a bricklayer, testified that there were

[Vollmer's Appeal.]

no windows on the west wall; that his orders were on the east wall "to leave out openings to insert window-frames hereafter, as (they) went along with the wall; (they) walled up four inches the outside of the window spaces; (they) ran up four inches of brickwork the outside of the wall and left nine inches of brickwork out inside where the window-frames were to go; this was done on each story but the first." After the roof was on he was directed to take out the four inches of brick to put window-frames in; he put the frames in; the bricks were put in according to orders to him, with a "straight joint" to be taken out. The defendant was present whilst this was being done. "According to the plan of the building it was a dead wall on the east, and made no provision for the spaces where the widows are." Joseph Denegre, Jr., the superintendent of the building, gave witness direction to leave spaces for windows to be put in thereafter. Witness said to him that windows could not be put into a party-wall. Dengre said they would put them in and take the brickwork out afterwards, and "they'll not know anything about it." Stein directed him to take out the bricks, and put in the window-frames. The windows could not be closed from the plaintiff's lot without scaffolding, and to close the windows from her lot would cost between $250 and $300.

George Read, a grandson of Judith McCall, a witness for plaintiff, on cross-examination testified that Harry McCall had the superintendence of the business of Catharine and Margaret McCall; they did not reside on this property at the time of their death.

John W. Jones, a witness for plaintiff, testified as to the situation and exposure of plaintiff's premises from the defendant's windows; that there are sixteen windows; that the shutters of one of the windows swing over her lot; the windows project over the lot about two inches; there is a cap on the wall which throws the drip on plaintiff's stable.

On cross-examination he testified, that the condition of the wall, windows, shutters, &c., was the same when plaintiff bought her house as at the hearing; that there is no gutter on the east side of defendant's roof to conduct the water; the windows in defendant's wall open inside as doors.

D. H. Shedaker, city surveyor, testified for plaintiff that the defendant's wall to the height of seventeen feet extends two and a half inches beyond what is authorized by law.

Harry McCall, for plaintiff, testified that he owned no interest in the premises of plaintiff in 1856, except a residuary interest after Robert McCall's death. Witness did not recollect being present when the east wall of defendant's building was being built, nor of having any conversation with the defendant on the subject of the wall or the windows, nor of having given any consent to the defendant or any one on his behalf to put windows into the

wall; that he never knew the wall extended on to the McCall property; there was no agreement made by witness that the defendant might take bricks out of the windows, and insert frames for the purpose of keeping them open, or any other agreement in relation to the wall.   On cross-examination he said he was aware the defendant had erected a large building there, he saw it from time to time, and thought it was all right.   Witness further said that during his agency for the McCall property, which was for five or six years before Margaret's death, he had an indistinct recollection of saying to defendant that witness would hold all responsible for an infringement of the rights of that property; the wall was up when witness first knew that there was a wall.

Joseph Denegre, a witness for defendant, testified that defendant's wall was built according to the line given by the city surveyor; that witness had all the control, that defendant left it all to witness, he told defendant to ask the owner of the McCall property to give the privilege of windows, it was delayed and witness said to defendant, "we will put openings for the windows on the inside, enclosed outside, have a straight joint, and if he gives you permission, will take the bricks out without trouble and put the windows in."   The building was put up and windows left open inside, because there was not time to go and see Mr. McCall. Mr. McCall was there when the building was being put up, he did not object that the wall was over the line; witness did not know whether the Misses or Mr. McCall gave consent to open the windows; scaffolding with materials to close windows could be had for less than $300.

Joseph Denegre, Jr., for defendant, testified: Mr. Harry McCall and the defendant were in the building talking about the windows.   "Mr. McCall told Mr. Vollmer that he could put them in, if at any time they saw proper defendant would shut them up. Mr. McCall said that defendant might put the window-frames in, and keep them till they wanted to use the party-wall.   Mr. McCall saw the recesses; the defendant called his attention to them and showed him how they were to be put in, and they were put in as he stated.   Many witnesses, workmen of the defendant, testified that the plaintiff's yard could not be seen without climbing up to the windows and stretching out, that without the windows the defendant would have to light his room with gas in day time, that the windows were no injury to the plaintiff's property; and other matters to support his allegations.

In rebuttal, Harry McCall testified, that he had no recollection of such an interview with the defendant as testified to by J. Denegre, Jr.; that witness was satisfied that he never authorized the putting in and opening windows, because he had no authority to do so, and because he had uniformly warned persons owning contiguous property, that the McCall property had certain rights

that must not be infringed; he believed the windows were put there without the knowledge or permission of the owners or himself as their agent. Witness testified that he was very little in Philadelphia whilst defendant's building was going on, and his attention had never been particularly called to it till after it was built.

The Court of Common Pleas (Allison, P. J.) decreed that the defendant be restrained from maintaining the said nuisance and is directed to abate the same and cause the window sashes and frames to be removed from the said wall and the space thereof to be built up with brick as well as the recesses left in the said wall, and the said defendant is ordered to make said wall a solid wall of the thickness required by the Act of Assembly, and it is further adjudged that nothing in this case shall prejudice any right or remedy in law or equity or otherwise, which the plaintiff may have for any encroachment on or occupation of her lot more than is allowed by law.

The defendant appealed from this decree and assigned it for error.

*A. V. Parsons*, for appellant.—The defendant denies injury and all other material allegations of the bill, which is conclusive unless overcome by two witnesses or corroborative circumstances and one witness: 2 Story's Eq. Jur. § 1528; Pember v. Mathers, 1 Brown's Ch. R. 52; Walton v. Hobbs, 2 Atkins 19; Janson v. Rany, Id. 140; Amat v. Bosco, 1 Vesey, Sr., 57; Cooth v. Jackson, 6 Vesey 40; East Ind. Co. v. Donald, 9 Id. 283; Pilling v. Armitage, 12 Id. 78; Savage v. Brocksopp, 18 Id. 335; Smith v. Brush, 1 Johns. Ch. R. 459; Hassler v. Bitting, 4 Wright 68; Light's Appeal, 12 Harris 180.

A man has a right to put windows in a building on his own ground although they should overlook his neighbor: Tapling v. Jones, 11 Jurist N. S. 309; Renshaw v. Beans, 10 Eng. L. & Eq. 417; Chambers v. Thompson, 3 Campb. 80; Moore v. Rawson, 3 B. & C. 333; Gale on Easements 357, 478; Daniel v. North, 11 East 372; Barker v. Richardson, 4 B. & Ald. 578; Parker v. Foote, 19 Wend. 309; Lawrence v. Obee, 3 Camp. 514; 3 Exch. R. 551; Brick v. Pash, 8 Jurist N. S. 360.

Where part of the neighbor's land is taken for a party-wall the builder may put windows in it within his own line, subject to being closed by the neighbor: 3 Kent Com. 437, 577; Matts v. Hawkins, 5 Taunt. 20; Cubitt v. Porter, 8 B. & C. 257; Haverstick v. Sipe, 9 Casey 368; Hoy v. Stewart, 2 Watts 331; Wheatley v. Baugh, 1 Casey 533; Hazlett v. Powell, 6 Id. 296; Maynard v. Esher, 5 Harris 222.

A court of equity has no jurisdiction, the bill not having been filed until eight years after the erection: Gray v. Ohio and Pa.

[Vollmer's Appeal.]

Railroad, 1 Grant 412; Richards's Appeal, 7 P. F. Smith 105. The regulation of party-walls belongs exclusively to the building inspectors: Acts 1721 and May 1855, *supra*.

*T. A. Clay* and *S. H. Perkins* (with whom was *William M. Kennedy*), for appellees.—If H. McCall did grant a license it did not bind the remainder-men or tenants for life: Hill *v.* Roderick, 4 W. & S. 221; Naglee *v.* Ingersoll, 7 Barr 185. The owners did not permit defendant to build under Act of April 15th 1782, § 9, 2 Sm. Laws 50, Purd. 779, pl. 11, under an erroneous opinion of his title. There was nothing to give plaintiff notice when she bought the lot of any right in the defendant: Norman *v.* Heist, 5 W. & S. 173. It was necessary to insert a special provision in the constitution to take private property for public use: Const., art. 9, § 26; Lambertson *v.* Hogan, 2 Barr 24; Brown *v.* Hummel, 6 Id. 87. The acts proved are to the damage of the plaintiff: Clark *v.* Martin, 13 Wright 289; Knight *v.* Beenken, 6 Casey 374. A party-wall is a servitude: Roberts *v.* Bye, Id. 377. A party-wall is a solid wall without openings: Act of February 4th 1721, 1 Sm. Laws 125, Purd. 778. Equity gives effect to the intention as against technical rules: Lewin on Trusts 83, 141, 249; Crest *v.* Jack, 3 Watts 240; Carr *v.* Wallace, 7 Id. 401; Kentucky Bank *v.* Schuylkill Bank, 1 Pars. Eq. Cas. 226. Aside from the party-wall acts, the defendant would be a trespasser; party-walls must be erected as provided by Act of May 7th 1855, Pamph. L. 464, Purd. 777 *et seq.*; Vansyckel *v.* Tryon, 24 Leg. Int. 140.

The opinion of the court was delivered, May 11th 1869, by

READ, J.—The Building Acts in England were principally directed to the preservation of dwellings from fire, and the main cause of them arose from the great fire of London in 1666. Two acts were passed in the reign of Charles the Second, and two in the reign of Queen Anne: 6 Anne, c. 31, and 7 Anne, c. 17, from which last acts our provincial legislation of 1721 was partially drawn. The provisions of these acts, so far as relate to fires, are stated by me in The Harmony Fire Company *v.* Trustees of the Fire Association, 11 Casey 496.

The Act of 6 Anne was for the better preventing of mischief that may happen from fires, and provided, that party-walls between house and house, shall be wholly of brick or stone, and of two bricks thick at least in the cellar and ground stories, and thirteen inches thick upwards from the foundation, quite through all the stories of each house, and eighteen inches above the roof. This applied to all houses within the bills of mortality. The Acts of 7 Anne excepted the houses on London Bridge, and made some additional regulations. Various acts were passed on this subject

in 1724, 1759, 1763, 1766 and 1772, until a general act was passed embodying all the former provisions, which was the 14 Geo. III., c. 78, which, owing to its obscurities, met the disapprobation of the bench.

The Metropolitan Buildings Act, 7 & 8 Vict. c. 84, was passed 9th August 1844, 1 Chitty's Collection of Statutes, 2d ed., 1851, p. 333. This act provided " with regard to party-walls in reference to the component materials thereof, every part of such party-wall must be built of sound bricks or of stone, or of such bricks and stone together laid in and with mortar or cement, in such manner as to produce solid work." P. 377. And it is further enacted, that all buildings not according to this act shall be deemed a nuisance. P. 340.

By the 27th section, if without the written consent of the adjoining owner, the owner of the premises shall make any opening in any *external* wall adjoining such ground or building (which means a wall built entirely on his own ground and not a party-wall), such adjoining owner can require him to stop up such opening with brick or stone work, and if he does not, then he may stop it up himself, and recover the expenses from the owner of the wall.

This act, with the exception of sections 54 to 63, both inclusive, is repealed by Act 18 & 19 Vict. c. 122, passed 14th August 1865 (1 Chitty's Collection of Statutes, 3d ed. 1865, p. 432), which is the present law regulating the construction of buildings in the metropolis and its neighborhood. The walls must be of brick or stone, or other hard and incombustible substances; no opening shall be made in a party-wall except where the buildings are united in the same occupation, and then only under very strict and peremptory regulations, such as requiring two wrought iron doors to close the opening.

On the 24th February 1721, the legislature of the province passed an act for regulating party-walls, buildings and partition fences in the city of Philadelphia, which had received its charter from the proprietary nearly twenty years before. It gave the appointment of surveyors or regulators to the mayor and commonalty in their common council, who were empowered to set out the foundations and regulate the walls between party and party as to the breadth or thickness thereof; which foundation shall be laid equally upon the lands of the persons between whom such party-wall is to be made, and the first builder shall be reimbursed one moiety of the charge of such party-wall, or for so much thereof as the next builder shall have occasion to make use of, before the next builder shall any way use or break into the said wall. The charge or value thereof to be set by the said regulators.

Persons were forbidden under a penalty to begin or lay the foundation of a party-wall before the same be reviewed and

[Vollmer's Appeal.]

directed by the regulators, from whose decision an appeal lay to the mayor and commonalty at the next common council.

This common-sense legislation was far in advance of that of the mother country. Similar laws were enacted in relation to the district of Southwark on the 26th March 1762, and to the southern parts of the Northern Liberties of the city of Philadelphia, on the 9th March 1771. These laws in full are to be found in 1 Hall & Sellers 101, 293, 390.

The city, as laid out by William Penn, was a parallelogram of two miles east and west from river to river, by one mile from north to south, with nine streets from east to west, of which two were its outer boundaries, and twenty streets running from north to south. The distance between the streets made very deep lots, whether fronting on the east and west, or north and south streets, and in the division of city property, led to narrow fronts with great depth, and to the erection of back buildings, a style peculiar to Philadelphia. The regulation of party-walls, so as to secure the largest inner front to dwellings, became, therefore, a matter of vital importance.

The Act of 1721 was revived and amended by the Act of 15th April 1782, 3 Sm. Laws 48, and the power of appointment of the regulators was subsequently vested in the corporation of the city. The appointment of regulators in the various districts outside of the old city, is to be found in the Acts of Assembly given in the note at page 11, of the edition of the ordinances, published by the direction of councils in 1851.

The claim for reimbursement of the moiety of the costs of a party-wall, was only a personal charge against the builder of the second house, and was *a chose in action* of the first builder, which has, however, been changed by the Act of April 10th 1849, Pamph. L. 600, and it now passes to the purchaser.

The duties of the regulators are now devolved upon the board of surveys, as constituted by the Acts of the 2d February 1854, 21st April 1855 and 13th May 1856, whose power extends over the whole of the present city. On the 7th May 1855, Pamph. L. 464, the legislature passed "An act to provide for the regulation and inspection of buildings in the city of Philadelphia, and for the better preservation of life and property," which, with the additional Act of 11th April 1856 (Pamph. L. 319, 20th May 1857, Pamph. L. 590, and 13th April 1858, Pamph. L. 244), form the present supervisory system over the buildings of the metropolis.

The practical wisdom of our colonial legislature one hundred and fifty years ago, laid the foundation of the Pennsylvania system of party-walls, a great and radical improvement upon the principles of the common law, as expounded by the English courts, and those of Massachusetts and New York. Their decisions are

collected by Mr. Washburn, in the second edition of his Law of Easements, ch. 4, § 3, p. 535.

The most striking instance of a just application of equitable principles, is to be found in Campbell *v.* Mesier, 4 John. Ch. R. 334, decided by Chancellor Kent in 1820, and of a narrow-minded one in Sherred *v.* Cisco, 4 Sandford's S. C. Rep. 480, decided by Judge Sandford in 1851. After speaking of the civil and the French law of servitudes, he says: "It may well be that sound policy dictates similar legislation in this state, but we do not feel at liberty to import doctrines from the civil law, however benign or equitable, which conflict with established common-law principles."

From this review of the doctrines applicable to party-walls, it is clear that it must be a solid wall (without openings), of brick or stone, or other incombustible material. This · is required by the policy, as well as the letter of the law. This is the doctrine enunciated by the present Chief Justice, in Vansyckel *v.* Tryon, 24 Leg. Int. (1867) p. 140. If the first builder does not comply with the law, and make the wall a solid one, "he becomes a trespasser and wrongdoer."

Mrs. Judith McCall was the owner of lot 1106 Chestnut street, twenty-four feet front on that street, and running back one hundred and one feet of that width, and then narrowing eight feet on the east, and widening four feet on the west side, making the width of the lot twenty feet, and running back of that width one hundred and twenty-eight feet to Sansom street. By her will, dated 8th March 1828, and proved December 14th 1829, she devised the same inter alia, to her three daughters, Margaret, Harriet and Catharine, and to the survivors or survivor of them for ever; Harriet died in 1848, unmarried, Catharine died in 1859, unmarried, and Margaret died in 1860, unmarried, having by her will, dated 26th of May 1852, and proved January 9th 1860, devised the said lot inter alia to her nephews, Peter McCall, Henry McCall and George Read, who by deed, dated April 6th 1864, conveyed the same to the present plaintiff.

On the 1st May 1856, Charles F. Beck and wife conveyed the adjoining house and lot to the west, No. 1108, to the defendant, Gottlieb Vollmer.

The defendant commenced the erection of a factory on Sansom street, in June 1856, six stories high, ninety-nine feet six inches in length, and the whole height seventy-five feet nine inches from the pavement to the roof. The cellar stone wall is twenty-two inches thick, eleven inches on each side from the centre of the wall. The surveyor gave the centre line. The brick wall of the first story is eighteen inches thick, and the upper part from there all the way up is thirteen inches thick. "The middle of the wall," says Denegre, Jr., "was on the line dividing the two lots,

nine inches of the eighteen-inch wall was put on Mr. Vollmer's lot, and nine inches on Mrs. King's lot also."

The 8th section of the Building Act of 7th May 1855 provides, "nor in any case shall any party-wall be placed on the adjoining lot, more than ten inches for the stone wall, or more than six and a half inches for the brick wall." (Pamph. L., p. 467.) "Proceeding with the east wall," says Mr. Reynolds, the bricklayer, my orders were to leave out openings, to insert window-frames hereafter; as we went along with the wall, we walled up four inches, the outside of the window spaces. I ran up four inches of brickwork, the outside of the wall, where window frames were to go, and left nine inches of brickwork out, where the window-frames were to go; this was done in each story, except the first. I was directed after the roof was on, and the floors laid, to go up there and take out those four inches of bricks, to put window-frames in; they were working there, the carpenters, when I went there to take out the bricks. They made the window-frames out of scantling, and I put them in each story; there were no sills that I remember put in; they were just scantling joined together; some of the frames were there when I went to take out the bricks, and some were made after I came there; until the roof was on, it was one solid wall. It might be *three* or six weeks after the roof was on, before I was sent there to put in the window-frames. I think it was six weeks. The roof was put on just as soon as it could possibly be put on. When we started the top bricks of the space, the others came out easily, because they were put in with a straight joint, to be taken out. That was my order to have it built in that way." "We were more than one day doing it—between three and five days— Mr. Vollmer was present at different times, while we were proceeding in the matter, two or three times a day;" on cross-examination by Judge Parsons, he testified, "Young Joseph (Denegre) said they were going to put in windows, and I said you can't put in windows in a party-wall overlooking another man's property. He said, 'Oh, we'll put them in, and will take out the brickwork afterwards, and they'll not know anything about it.'"

Frank B. Rose says, "My attention has been directed to Mr. Vollmer's wall, as seen from Mrs. King's lot. There are sixteen windows in the wall, upon one of the windows there are shutters that swing over her yard. The window sashes of all the windows open as doors, inward, *i. e.* into the shop of Mr. Vollmer. There are window-sills, I believe, to every window, what I should term window-sills; their projection is not uniform, it varies slightly from one to two inches, I suppose."

There were no windows in the west wall of Vollmer's factory, it being a long dead wall of nearly one hundred feet in length, and if the east wall was without opening, all the stories must have been lighted with gas in the day time. "If all the sixteen win-

11 P. F. SMITH—9

[Vollmer's Appeal.]

dows were closed, it would darken Mr. Vollmer's shop very much,"
says one of the defendant's witnesses.   " He would have to light
it with gas."

It is clear, therefore, that it was a deliberately formed plan of
the defendant, to run up this wall apparently solid, so as to deceive
the building inspectors, and the owners and tenants of the adjoin-
ing lot, but with sixteen openings, for windows masked by four
inches of brickwork, which were taken out when the roof was put
on, window-frames put in, the windows opening inwards, and one
of them having outside shutters; it was a scheme to get light for
his factory surreptitiously, and in direct violation of law.   In
erecting the wall he took of his neighbor's ground one inch
more for the cellar wall, and about two and a quarter inches more
for the brick wall of the first story, than he was entitled to.

The wall was, therefore, built in direct violation of the letter,
spirit and policy of the law, and, in the language of the English
Building Act, would be a nuisance.

Of the injurious effect on the comfort and convenience of the
adjoining owner and the tenants, there needs no proof, nor as to
the damaging effect upon the value and price of the house and lot
of the plaintiff.

There is no dispute that the plaintiff can close all these windows by
erecting a board fence of one hundred by seventy-five feet, at great
expense, and taking up an additional portion of her own ground;
but whilst there is a court of equity open to her she certainly
ought not to be obliged to resort to such a remedy, and to abate
a nuisance by her own right hand.   All the cases in which this
remedy has been used are where the wall in which the windows
are placed is erected entirely on land belonging to the owner of it.
Those windows are legally opened, and can only be so closed
legally.   But the windows in this party-wall are wrongfully and
illegally put there, contrary to law, and with a direct intention to
do an unlawful act for the private benefit of the defendant.   Using
the language of the English Building Act, it is a nuisance, both
public and private, and is clearly within the restraining powers of
a court of chancery.

In his answer the defendant says: " That when the said win-
dows were put in the said building by the workmen, Henry Mc-
Call was there, who claimed to be the owner of the house and lot
east and adjoining that of this respondent.   When a conversation
was had upon this subject, when said McCall told this respondent
that he had no objection to the windows being placed on the east
wall of the said building, only that in so doing he, the said owner
of said lot, should not be prevented from the erection of a build-
ing on their said lot, and that the said defendant should not claim
any privilege by the use thereof, that ancient lights were not to
be obstructed."   And this respondent denies that said party-wall

was wrongfully erected, but says that the said windows were put upon the east wall of said building, where they now are, with the full consent and ·approbation of the said Harry McCall, who claimed to be the owner or part owner of the said adjoining lot, now alleged to be owned by the said complainant in said bill.''

"And further answering, saith that said windows, cases and sashes were put in his said building with the consent and by the approbation of Harry McCall, the then alleged and supposed owner of the said adjoining lot. And this respondent, further answering, denies that the open space within the outer limits, sides or bounds upon and over ground are not part of her ground and lot in her possession, and the uses thereof, under and subject to her control and disposition, only as the same are governed by the statute laws of the state."

The defendant claims the light through said windows as given him by the Ruler of the universe; that "He who sendeth rain upon the just and the unjust, has given the light as it now shines to the said complainant and his respondent."

And this respondent, further answering, saith, "that no written papers were given by any one relative to the erection of said east wall of his building, or the placing of said windows in the said wall, but a license by parol was given by Harry McCall, who, at the time the said building was put up, was the owner or part owner thereof, and claimed to be such owner of the said premises now claimed by the complainant."

These statements of an alleged license by the defendant are not responsive to the bill, but are affirmative allegations in avoidance of the plaintiff's demand, which the defendant is bound to establish by independent testimony. A cardinal error running through the whole of them is, that the title to the lot of plaintiff was in 1856 vested in Catharine McCall and Margaret McCall, whose tenant was "one Tompkins," and that Henry McCall was neither an owner nor part owner of it, nor had any interest in the same.

Joseph Denegre, the builder in whose name the building permit was taken out, said: ·"Before the foundation wall was laid, the city surveyor was employed to give us the line. I called on the building inspectors, when they came there; they came to see the size of the wall I was putting up, i. e. the cellar wall; stone wall."

"When we got up high enough to put in the windows, above the first story, where the windows are, then I told Mr. Vollmer to go and ask the owner of the property if he would give him the privilege to have windows on the east side, but it was delayed. Then I said to Mr. Vollmer, 'we will put the openings for the windows on the inside of the wall, enclosed outside, and have a straight joint; then if he gives you permission we will take the bricks out without trouble and put the windows in. You can tell

Mr. McCall that any time he wishes to have them shut you will shut them up.' Then the building was put up and the windows were left open inside and shut up outside, because we could not wait for him to go and see Mr. McCall; we had to go on. To the best of my knowledge the roof was on and the floors all laid before the windows were put in. I can't tell how they came to be put in; it must have been by his asking Mr. McCall. It must have been with the consent of Mr. McCall." He never heard any person give permission to Mr. Vollmer to open these windows, and it is clear from the whole of his testimony, that the defendant never told him at the time that he had got the consent of any one.

Joseph Denegre, Jr., says: "I saw Mr. Vollmer and Mr. Henry McCall come into the building. They were talking about the windows, and Mr. McCall told Mr. Vollmer that he could put them in, if at any time they saw proper Mr. Vollmer would shut them up."

Mr. McCall distinctly contradicts these witnesses, and it is certain, that in acting for the owners, who were never applied to by the defendant, that he never intended to give, nor did he give any permission which could not be revoked at any moment. If the father and son are to have their testimony properly weighed, the utmost that can be drawn from the two statements is, that the defendant did exactly what the elder Denegre advised him to do, to get a revocable license. If, therefore, this is conceded to the defendant, it disposes entirely of the question of acquiescence and lapse of time. The sale and conveyance to the plaintiff operated as a revocation, and there has been no delay on her part in asserting her rights.

The irregularity in the location and building of the party-wall, the determined infraction of the law in these sixteen openings in what should have been a solid wall, in increasing the number of stories from five to six, and in heightening each story, evinces a strong disposition on the part of the defendant to make the property and rights of his neighbor entirely subservient to his own interest, and this without the slightest consideration moving from the defendant to the adjoining owners.

The court below arrived at a correct conclusion, and the interest of the community requires, that these attempts to render our wise party-wall system nugatory should be put a stop to.

The decree is affirmed and appeal dismissed at the cost of the appellant.

WILLIAMS, J.—I dissent from this opinion on the ground that the plaintiff and those under whom she claims have been guilty of such laches, that she is not entitled in equity to the relief which she seeks.